O’Neall, J.
delivered the opinion of the Court.
In these cases it*will be necessary to consider the following questions only: — 1st. Were the slaves, to whom the testator bequeathed their freedom, after the death of his wife, liable to capture under the act of 18001 2d. Did the act of 1820 prevent their emancipation 1 3d. Was the estate of Mrs Wright, by the operation of that act enlarged into an absolute estate 4th. Do the slaves revert to the. estate of the testator 1 5th. To what extent - ought the plaintiffs to recover? '
These are questions of no little novelty and importance ; and I regret, that neither my time nor opportunity will allow me, in the examination of them, to travel over the whole range occupied by the argument. The conclusions, however, to which Í have arrived on each of the questions, are perfectly satisfactory to my own-mind; and will, I hope, when the reasons are stated, upon which they are founded, be equally so to the parties concerned.
1st. The act of 1800 provides, that it shall not. be lawful for any person, or persons, to emancipate, or set free, his, her, or their slave, or slaves ; except upon signifying such intention to some justice of the quorum : who is required to summon five freeholders, before whom, the said person, or persons, shall produce the slave or slaves, and answer,all questions, which may be asked concerning the character of the said slaves, and his, her, or their ability to gain a livelihood in an honest way ; and if the said freeholders, upon such examination, shall be satisfied, that the slave, or slaves, are of good character, and capable of gaining a livelihood in an honest way, then they are to grant a certain certifi *638 cate to that effect. The act further provides, that no emancipa-t>°rl °fa slave shall be lawful, except it be by deed, and accord-big to the above regulations: and that an attested copy of the said deed, recorded by the Clerk of the Court of the district, s^a-' be delivered to the said slave, within ten days; and that the deed, if not recorded within six months, shall be void. And in case any slave shall be emancipated, or set free, otherwise' than according to this act, it .is further provided, that it shall and may be lawful, for any person whatsoever, to seize and convert to his, or her, own use, and to keep as his, or her, property, the said slave, so illegally emancipated, or set free. 2 Faust, 355-7. 2 Brev. Dig. 255-6.
).24.
In the construction of this act, and its application to this case, it is important to inquire : 1st. What was its object? 2d. Could not its provisions be literally complied with by the executors, and freedom given to the slaves? 3d. Until the executors asset!ted to their freedom, by permitting them to go at large, without complying with the provisions of the act of 1800, were they so emancipated, or set free, as to be liable to capture?
The object of the act was, obviously, none other than to prevent slaves of bad character, or slaves who were incapable of gaining a livelihood by honest means, being set free. This intention is manifest from the preamble, which recites, that “ Whereas, it hath been a practice for many years past in this State, for persons to emancipate, or set free their slaves, in cases where such slaves have been of bad or depraved characters,'or from age, or infirmity, incapable of gaining their livelihood by honest means : To prevent which practice in future, Be it enacted, &c.” 2 Faust, 355.
Every provision of the act is in furtherance of this object; and 'taking this to be the clear object, and intention of the law, could not the executors emancipate the slaves now in dispute? They are, in law, the legal owners of the personal estate of their testator. This legal estate, it is true, is subject to' the trust for the payment of his debts ; and afterwards to be disposed of accord-to the directions of the will. Before the act of 1824, they could, without any authority from the ordinary, have sold it, and their sale would have been good. They may, even now, by neglecting to sue for the personalty converted, either before, or after their testator’s death, for more than four years, not only bar *639 their own right of action, but' also that of the specific legatee. They are, therefore, for all legal purposes, the owners; the slaves ave their slaves; they can signify their intention to emancipate, they can produce the slaves, answer the questions touching both their character, and ability, and can execute the deed. This would be a literal compliance with the act, and, unless it would defeat its intention, must prevail. The intention we have seen was to prevent bad slaves, and slaves incapable of gaining a livelihood in an honest way, from being turned loose on the community. The executors are generally members of the testator’s family, or his most intimate friends; often as well acquainted with his slaves as himself. When this is the case, they could be as much relied on for information as to the character, or ability of the slaves to gain a livelihood in an honest way, as the” owner. When this was not the case, they would only have to inform themselves as to these points, or test them both by a trial of the slaves, before application to tbfe magistrate and freeholders for their certificate.
Bur. it is said, that emancipation must be by deed, and not by will. This is true: and if the will itself could confer freedom, without the assent of the executors, the argument would be conclusive. But the will is only the executors’ authority to dispose of the testator’s property, as he would have done himself. To do this, they must do every thing which is necessary to make it lawful: and here their assent to the legacy, to give it a legal effect, can be given, only by proceeding according to the provisions of the act of 1800.
If emancipation is not complete until the assent of the executors is given, it follows, that a capture cannot be made before: for the assent of the executors to their freedom is necessary to permitting them to go at large. If they do this without complying with the act of 1800, they are then, and not before, slaves without an owner, and belong to the person who may take them into possession.
Following up the construction here given to the act, we are met by another difficulty. Is the assent of the executors, that the tenant for life should take and hold the slaves for her life, an assent to the freedom bequeathed to them at her death 1 This question, however, admits of a ready answer in the negative; for after the determination of the life estate, something remained to *640 be done by the executors to give legal effect to the remainder; to wit, their examination before the magistrate and freeholders, and the execution of the deed. The rule is uniform, that where any thing re,mains to be done by the executors to give effect to the testator’s intention, after a particular estate, their assent to the enjoyment of the particular estate by the tenant, will not imply an assent to that in remainder; but the right of property is still in them, and on the determination of the particular estate, they are also intitledto the possession. This is the case before us. The executors, if Mrs. Wright had died at any lime before 1820, might have gone before the magistrate and freeholders, obtained their certificate, executed the deed of emancipation, and set the slaves free. If this be true, it follows that no capture could be made during her life estate ; for during that period, the executors had not assented to their freedom.-
But it is said, that the tenant for life might surrender her life estate, assent as executrix to the freedom of the slaves, and then capture thení. I apprehend, however, that she could hardly be allowed to pursue that course. She took first as executrix, and then as tenant for life ; and her duty as executrix would, upon giving up her life estate, have been, to assent to the freedom of the slaves, in such a manner as to give it legal effect. If she failed to discharge this duty, and suffered the slaves to go at large, as emancipated, and set free, other persons might have availed themselves of her wrong, and captured them: but if she had captured them, she would still have been liable to the trust to emancipate them legally; and she would have been com pelled to execute it. For it is a maxim coeval with the law itself, that no one Shall-be allowed to take advantage of his own wrong. Under the will, the right to freedom could not commence, until the death of the tenant for life. The words of the will are, “ after her death, I give Leah, Esther, and Letty, their freedom.” This was not a legacy debitum in presentí, sohendum in futuro, but strictly one commencing, both in right, and possession, at a future day. To give it effect, there was wanting the assent of the executors, executed according to the act of 1800. If, therefore, the tenant for life had surrendered her life estate, the slaves, for her life, must have remained the property of the executol-s, for the use of the testator’s estate, until their right to freedom had vested. It is very possible, that she and the ^executors together, by uniting *641 her estate to the freedom bequeathed in remainder, might have legally emancipated, and set them free.
To emancipate, and set free, under the act of 1800, certainly means parting' with the possession of the slaves, and permitting them to go at large, and act f<u- themselves. This was the evil, to remedy which in the instances of bad slaves, and slaves incapable of gaming a livelihood, the law was passed. So long, therefore, as slaves are retained in the actual possession of a master, whether for life, or for years, the evil complained of, and intended to be remedied, by the act, has not occurred, and hence they are not lit ble to capture. The slaves, during the lifetime of Mrs. Wright, were in her possession; and after her death, her estate, and’legal posse-sion of them, did not determine, until her crop was finished. Act of 1789, P. L. 494. 1 Brev. Dig. 385. She died on the 8tf. of October, 1828; and as her crop was not then finished, her possession of the slaves, for the purpose of finishing it, might have continued to the last day of December of that year. The d-'f‘idant made his capture on the 9th October: but this was before the possession of the tenant for life, or ra!her of those who held her estate, terminated ; and before, therefore, even the inchoate right of the slaves to emancipation could be said to be vested. For ibis invasion of possession the defendant was liable as a trespasser; and from these views it is clear, that the slaves were not liable to be seized under the act of 1800; and that neither Mrs. Wright, nor the defendant, can derive any right from their respective captures.
I am aware, that this construction of the act, and decision under it, are at variance with the decision of the Court of Appeals in Equity, which existed prior to the year 1824, in the cases of Pylant held, that the capture might be made during a life estate ; and, in the first, actually compelled the executors to assent to the legacy of freedom to the slaves, in order to make the rights of the captor good. I presume, however, that in these cases the question was not presented, whether the executors could not emancipate the slaves under the act of 1800. If, however, it was made, and the point expressly decided, yet this Court is not bound by it. Up to 1824, vve had t« o co-ordinate tribunals, pronouncing on cases in Law, ?.>d Equity, in the last *642 resort, and often differing in their decisions on the same legal questions : and it was to remedy this evil, and insure uniformity of decision, that this, Court was established. In the discharge of this high trust, it has the unquestionable right to review hot only its own decisions, but also those of the Courts in whose place it,was created : and the decisions of the old Court of Appeals in Equity, although intitled to great respect, as the decisions of wise and learned men, cannot certainly be regarded as imperative; but when, in the judgment of this Court, they are clearly erroneous, they must be overruled.
2d. We have seen, that, under the act of 1800, the executors might have legally emancipated the slaves, at the death of the widow of the testator, if this event had taken place before 1820. The second question now arises, whether the act of 1820 prevented their emancipation, at her death in 1828. I am satisfied that it did. The right to freedom was not a vested legal right, at the testator’s death ; but was one which might, or might not, arise. ' If the executors, on applying to the magistrate and freeholders, had failed to shew, that the slaves were of good character, or of sufficient ability to gain their livelihood in an honest way, there would have been, in law, a negation to their freedom. This application too, it must be borne in mind, could not bo made until the death of the testator’s widow ; for until then, they were to be her slaves, and until then, he had not directed his executors to permit them to go at large. Until this period, •in this point of view, their right to freedom had not commenced. But a legacy cannot be given to a slave; for he. can have no right, whatever, which does not, the instant it is transferred to him, pass to his master. Every thing which belongs to him, belongs to his owner. In other words, he is in law himself chattels personal; and it would be absurd to say, that property can own properly. The will directing them to be set free is not, therefore, to be regarded as bequeathing a legacy to persons, who can take it; but as merely directory to his executors to do an act, on a particular event, which is then to confer freedo'm..on the slaves, and make them capable of acquiring the rights of property. It would hence follow, that the slaves had no rights, to be defeated by. the act of 1820. If the testator himself could’not, after 1820, had he been alive, emancipate and set free his slaves, it follows that his executors could not. It is clear he could not t for every one *643 bolds his property, subject to the control of legislative enactment s, as to its subsequent disposition; and the.act of 1820 directs that no slave shall, after its passage, be emancipated, or set free, save by act of the legislature alone. Acts of 1820, p. 22. The intention of the testator is, therefore,'defeated by the fact, that his executors, at the time fixed to cany it into effect, have no power legally to accomplish it.
3d. As the widow lived nearly eight years after the act of 1820, it is contended, thafby its operation, her estate was enlarged into an absolute estate. It is not perfectly clear, that when a devise, is to one for life, and the limitation over too remote, the tenant for life takes an absolute estate. In some cases it would certainly have this effect: but in others, Fearne seems to think it might not. Butler’s Fearne, 486. It is not necessary, however, to look for argument upon a case not before the Court. It appears to me, that, if the limitation over were good at the testator’s death, any subsequent event defeating it cannot enlarge the life estate. For the sake of illustrating this idea, let us suppose that
A. bequeaths a slave to B. for life, remainder to C.; and before the death of B., C. dies: to whom would the remainder go? would it enlarge the life estate ? It would not: it is a vested interest in C., and would go to his executor or administrator. If A. bequeaths a slave to B. for life, and if C. should be alive at the death of B., then remainder to him; and C. should die before B.: would B. be intitled to hold the slave absolutely ? It is obvious he would not. The contingency on which C’s rights were to vest, has not happened, and therefore, he takes nothing by the bequest; but B’s estate is not therefore enlarged, because, by possibility, C. might have taken. If the bequest had been to B. and his issue; then, the limitation over being too remote, an. absolute estate would vest in the first taker, because the testator has parted with his entire interest, and manifested his intention, that it should go in the line of the first taker: and the limitation over is against the poliey of the law. And it is the nearest approach to the intention of the testator, which, in law, we can make, to say, that the first taker shall take absolutely. In the case before us, the testator has expressly limited the estate to his widow for life, and at her death has bequeathed freedom to his slaves; so that it is manifest, that he did nbt intend them, in any event, to be hers, for a longer period than her life, or that after *644 her death,' they should go to her descendants claiming through her. The remainder, if it may be so called, is to strangers to her blood; and if they cannot take, there is no connexion between theni and her, which on their failure to take will enlarge her estate. At the death of the testator, and for twelve years after, if his widow had died, the slaves might have been emancipated ; and so long as this event was possible, and lawful, it will not be preteuded, that she had any greater estate than for her life. The happening of an event, which destroyed the contingent remainder before it vested, could not, alter her estate, so as to either increase, or diminish it.
4th. The widow not being intitled to hold the slaves absolutely, and their emancipation being defeated by the act of 1820, what becomes of them 1 Do they revert to the estate of the testator! I apprehend that they do. It is the same thing as if the testator, after giving a life estate, had failed to dispose of the re^ mainder. In that case they revert to the executors, or administrators, for the benefit of the testator’s residuary legatees, or dis-tributees. Geiger v. Brown, 4 M’C. 427-8. In another point of view, too, they must be regarded as in possession of the executors, for the benefit of the residuary legatees, or distri-butees, as fhé case may be. The assent of the executors, evidenced by a deed executed according- to the provisions of -the act of 1800, was, before 1820, necessary to confer freedom on the slaves. Hence the right of property, in remainder, stdl remained in them, notwithstanding the widow had the possession for life. The right of property being in them, and the intended application of the remainder being defeated, by the operation of the act of 1820, they (or, more properly speaking, as the executors are now all dead, the administrators with the will -ninexed of William Wright deceased) as trustees for the residuary legatees, or distributees, are intitled to the possession of the slayes for the purpose of distribution.
5th. To what extent ought the present' plaintiffs to recover t They are the trustees, to whom the widow, after her capture, .conveyed the slaves to the use of herself for life, and after her death for the use of other persons in remainder. We have seen that her capture was void ; and her only legal interest in them was therefore her life estate. She died on the 8th of October, 18¿8, and the defendant took possession of the slaves the day *645 after her death ; her crop was not finished at her death, and these slaves were employed in it. The 23d section of the act of 1789,-wh.'di has already been referred to, directs, that “ if any person shall die after the first day of March, in any year, the slaves of which he or she was possessed, whether held for fife, or absolutely, and who were employed in making a crop, shall be continued on the lands, which were in the occupation of the deceased, until the crop is finished, and then delivered to those, who have the right to them.” P. L. 494. Until the crop is finished, by being gathered from the fields, for use, or market, her estate for life was not determined. At what time it must be finished, is, I think, fixed by another part of the same section of the act, which provides, that all emblements of the lands, which shall be severed before the last day of December following, shall be assets in tbé hands of the executors, or administrators ; but. that all such, as are on the land between the last day of December and the first pf March, shall pass witn the lands. Ibid. The reasonable construction of the first part of the act, by the last, would be, that the .crop should be finished by the last day of December; for on that day ceases the interest of the tenant for life in the crop, and at the same time must end'her interest in the slaves, who were engaged in making it. If, however, the crop wi re actually finished before this time, I have no doubt,- that when so finished, her interest in the slaves determined.
It is said, however, that the tenant for life, or rather her representatives, are bound, under this act, to deliver up the property to those who may be mtitled to it; and that if they fail to do so, they are liable for its value: and, therefore, the plaintiffs ought, by reason of this liability, to recover the full value of the property from the defendant. The position assumed is undeniable, when the representatives of the tenant for ljfe are in possession, or have improperly parted with it. Rut when the possession is taken from them without their fault, they áre not. liable. If even, however, the plaintiffs were liable for the value of the property, the conclusion drawn from it does not necessarily follow. They can only recover damages for the in jury done to their legal right of property, and possession ; and this is only for the time between the death of Mrs. Wright and the last day of December in the same year, or when her crop vyas actually finished, if that ?.s sooner, than that day. For the value of the hire of the slaves *646 during this time, with the interest thereon, the plaintiffs are in-titled to recover. The present verdicts include the value of the slaves, as well as their hire, and are, therefore, erroneous, and must be set aside.
Motion granted.